UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEWEENAW BAY INDIAN
COMMUNITY,

        Plaintiff,

                                File No.  2:03-CV-111

v.

                                HON. ROBERT HOLMES BELL

JAY RISING, et al.,

        Defendants.

_____/

## O P I N I O N

    Plaintiff Keweenaw Bay Indian Community ("the Community") is a federally recognized Indian tribe. (LaFernier Aff. ¶ 2).  The Community has approximately 3,313 total members, 868 of whom live on the Community's Reservation and trust lands in Baraga County in the Upper Peninsula of Michigan, and approximately 500 of whom live outside the Reservation in neighboring Baraga, Marquette, Houghton and Ontonagon Counties. (Misegan Aff. ¶ 2).

    Defendants (collectively referred as "the State") are Jay Rising, Treasurer of the State of Michigan, and Harrold Reid, formerly a detective/sergeant with the Michigan State Police, and Timothy Blanksvard, currently a detective/sergeant with the Michigan State Police.

    In this action the Community challenges the State's efforts to collect state taxes on cigarettes sold by the Community at its two gaming facilities in Marquette and Baraga and

at the Pines Convenience Center in Baraga. (LaFernier Aff. ¶ 6). These facilities are owned and operated by the Community and are located within the Reservation or on lands that have been taken into trust on behalf of the Community. (LaFernier Aff. ¶ 6). The facilities are all located within the area ceded by the 1842 Treaty. The Community's retail sales of cigarettes constitute an important and integral part of the Community's revenue-raising and economic development activities. (LaFernier Aff. ¶ 5).

The imposition and collection of state excise taxes on tobacco products in Michigan is regulated by the Tobacco Products Tax Act ("TPTA"), M.C.L. §§ 205.421-205.436. The TPTA establishes a tax on tobacco products, M.C.L. § 205.427, and requires those who manufacture, transport and sell tobacco products to obtain a license to "purchase, possess, acquire for resale, or sell a tobacco product." M.C.L. § 205.423(1).

From 1977 to 1997 the Community and the State operated under an agreement governing the imposition and collection of the state taxes on cigarettes, gasoline, diesel fuel, sales and use taxes. (LaFernier Aff. ¶ 7). The State terminated the agreement in 1997. In the late 1990s the state began negotiating with eleven of the twelve federally recognized Native American tribes in the state in an effort to enter into comprehensive tax agreements covering multiple tax issues, including cigarette taxes. (Fratzke Aff. ¶ 7). Eight of the tribes have executed substantially similar comprehensive tax agreements which give them the option of selling untaxed tobacco products to tribal members who reside within a negotiated Agreement Area under either a quota or a refund system. (Fratzke Aff. ¶¶ 10, 12). The State

has been unable to reach agreement with the other three Tribes, including the Community. (Fratzke Aff. ¶ 11).

Upon the termination of the previous tax agreement in 1997, the Community began to sell tobacco products on its Reservation and trust lands to all of its customers, Indians and non-Indians alike, free of the Michigan tobacco products tax.  (LaFernier Aff. ¶ 9).

By letter dated December 8, 1999, Michigan State Treasurer Mark A. Murray informed the tribes that the State had changed the manner in which it would collect Michigan's tobacco and motor fuel taxes.

> To more effectively facilitate the collection of these taxes, the State will now require all wholesalers and/or unclassified acquirers to collect these taxes at the point of sale even where the retail purchaser is an Indian Tribe or tribal-member.  In addition, all packs of cigarettes sold at retail from within Indian Country will bear a special stamp applied by the wholesaler to clearly indicate that tax has been paid. . . . The State of Michigan fully recognizes that Indian Tribes and their members are exempt from Michigan's motor fuel and cigarette taxes where the taxed activity takes place within their respective Indian Country.  Therefore, retailers located within Indian Country can file for a refund on sales to that Tribe or its members.

(Fratzke Aff., Ex. A).

Since January 1, 2000, the State has made available a refund system for tribes that do not have a comprehensive tax agreement with the State.  Under the refund system tribes can purchase taxed tobacco products from TPTA licensees and file claims for refunds of the tobacco taxes on sales to their qualified members.

The State Treasury Department received numerous complaints from competitors of tribal businesses that the tribes were selling high quantities of cigarettes at a price below the

3

wholesale cost of tax prepaid cigarettes.  (Fratzke Aff. ¶ 67).  In January 2000 the Michigan State Police Tobacco Tax Team began investigating whether Michigan Indian tribes were importing untaxed tobacco products in violation of the TPTA.  (Reid Aff. ¶ 15).  In 2000 and 2001 the State made seizures of untaxed cigarettes from delivery trucks in transit to Native American retailers in the Upper Peninsula.  (Reid Aff. ¶ 18).  In 2001 the State seized untaxed tobacco products being transported to the Community's Pines Convenience Center.  (Reid Aff. ¶ 26).  In an effort to prevent further seizures of tobacco products purchased by the Community for retail sale, the Community began arranging to receive tobacco products through the mail rather than by truck delivery.  (LaFernier Aff. ¶ 10).

In January 2002, U.S. Postal Inspectors for the Kinsford Mail Processing Center near Iron Mountain, Michigan, alerted the Tobacco Tax Team that it was receiving containers of cigarettes form New York that were addressed to various addressees in Baraga, Michigan.  The Tobacco Tax Team obtained warrants from the Dickinson County District Court.  Four searches were conducted on January 10, 14, 18, and 23, 2002, and the State seized over 180 boxes of tobacco products from the U.S. Postal Service mail processing center in Kingsford, Michigan, that were addressed to Joe Waara, WCUP-FM, American Made Tubcraft Plus, Chippewa Trading Co., and Keweenaw Bay Outfitters.  (Def. Ex. 1-4).  Each box contained between 30 and 60 cartons of cigarettes or over 200 cans of snuff.  (Def. Ex. 1-4) None of

the addressees was licensed as an "unclassified acquirer" under the TPTA.[1]  (Thelen Aff.

¶ 26).  According to the Community, the seizures included 44 parcels containing 2,500

cartons of the Community's cigarettes that were intended for sale at the Community's sales

facilities.  (LaFernier Aff. ¶ 10).

The Department of Treasury advised the Community that the cigarettes had been

seized as contraband pursuant to the TPTA, M.C.L. § 205.429.  (LaFernier Aff. ¶ 11).  The

Community requested an administrative hearing pursuant to M.C.L. § 205.429(3).  The

hearing resulted in a finding that the cigarettes be forfeited to the State as contraband.

(LaFernier Aff. ¶ 12).  The Community filed a petition for review in the Dickinson County

Court, and then filed this action challenging the application of the TPTA to the Community.

(LaFernier Aff. ¶¶ 13-14).  The Community has sued Jay Rising, Treasurer, and two officers

_____

[1]The TPTA defines  "unclassified acquirer" as follows:

(v) "Unclassified acquirer" means a person, except a transportation company
or a purchaser at retail from a retailer licensed under the general sales tax act,
1933 PA 167, MCL 205.51 to 205.78, who imports or acquires a tobacco
product from a source other than a wholesaler or secondary wholesaler
licensed under this act for use, sale, or distribution.  Unclassified acquirer also
means a person who receives cigars, noncigarette smoking tobacco, or
smokeless tobacco directly from a manufacturer licensed under this act or from
another source outside this state, which source is not licensed under this act.
An unclassified acquirer does not include a wholesaler.

M.C.L. § 205.422(v).

5

of the Michigan State Police, Harrold Reid and Timothy Blanksvard who participated in the seizure of cigarettes at the Kingsford mail processing center.

Subsequent to the January 2002 seizures the Community began purchasing taxed tobacco products and then requesting refunds from the State.  As a result of the need to pay the Michigan tobacco products tax on its sales of tobacco products to customers who are not members of the Community, the Community's net revenues from the sale of tobacco products dropped from $556,789 in 2001, to $125,963 in 2002.  (LaFernier Aff. ¶ 15).  The Community continued to purchase taxed tobacco products and to file tax refund claims with the Michigan Department of Treasury from February 2002 and April 2004.  However, the Department of Treasury refused to issue refund claims totaling $138,260 for August 2003, December 2003, and April 2004, based on the State's determination that the Community's sales to its members in August 2003 exceeded the amount of cigarettes that those members could reasonably have been expected to have consumed in a one year period.  (Fratzke Aff. ¶¶ 47-50).  The State arrived at this "flag" amount based on statistics regarding the Community's population, the Surgeon General's statistics on Native American smoking rates, and empirical data regarding cigarette consumption of other Native American tribes. (Fratzke Aff. ¶¶ 32-46).  The State also had evidence that one Community member was purchasing between 100 and 152 cartons of cigarettes per month and selling them over the Internet. (Fratzke Aff. ¶ 49; Sutherland Dep. at 8-17).  The State's refusal to issue the refunds prompted negotiations between the State and the Community's attorney regarding the number

of refundable sales.  The State proposed an annual quota or refund ceiling for the Community of 3,281,000 cigarette sticks, and the Community representatives proposed an annual quota or refund ceiling of over 8,000,000 cigarettes.  (Misegan Aff. ¶ 3).    The negotiations did not result in a resolution.  (Fratzke Aff. ¶¶ 51-54).

On February 2, 2004, the Community decided to resume purchasing state tax free cigarettes and to offer them to the Community.  (Pl. Att. A, Ex. 4).  On April 13, 2004, the Tribal Council passed a motion to purchase tax-free cigarettes, to limit the amount of cigarettes a tribal member may purchase to two cartons per week, and to set the price to $30.00 for non-members and $25.00 for tribal members.  (Pl. Att. A, Ex. 5; LaFernier Second Aff. at ¶¶ 16-17 ).

Michigan has had an excise tax on cigarettes since 1947.  The State raised $891.8 million dollars in tobacco taxes for fiscal year 2003, representing 4.1 percent of total tax revenues.  (Darragh Aff. ¶ 13).  In July 2004 cigarette taxes were increased from $1.25 per pack to $2.00 per pack (from $12.50 to $20 per carton).  (Darragh Aff. ¶ 10; Fratzke Aff. ¶ 30).  In fiscal year 2004, the tobacco tax raised $992.8 million.  (Darragh Aff. ¶ 13).  TPTA taxes are deposited in the School Aid Fund financing K through 12 education, the Healthy Michigan Fund, and the Medicaid Fund.  (Darragh Aff. ¶ 15; Duncan Aff. ¶ 6).

In an opinion and order dated September 30, 2004, this Court held that the legal incidence of the TPTA falls on the consumer rather than on the Community and accordingly

7

dismissed Counts I through III of Plaintiff's complaint. (Docket # 96).  On December 21, 2004, the Court denied the Community's request for interlocutory appeal. (Docket # 125). On March 24, 2005, the Court granted leave to the Community to file a second amended complaint.  The second amended complaint consolidated the claims with respect to the 1842 Treaty and dropped claims based on infringement of tribal self-government and  the Indian Commerce Clause.  (Docket # 157).

Defendants have moved for summary judgment on the remaining counts IV through XII.  Plaintiff has moved for summary judgment as to Counts IV through VI and VIII through XI, and for partial summary judgment as to liability only as to Count VII which seeks damages under 42 U.S.C. § 1983.[2]

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the non-moving party must demonstrate by affidavits, depositions, answers to

---

[2]Although Defendants incorporated a counterclaim in their answer to Plaintiff's second amended complaint, they withdrew that counterclaim on May 5, 2005. (Docket # 175).

interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In reviewing the motion "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

## III.

### A.  Count IV – Burdens Imposed by the Refund System

In Count IV of its second amended complaint the Community seeks a declaration that TPTA as administered and enforced against it violates the Supremacy Clause of Article VI of the United States Constitution.

A state has no authority to tax cigarettes sold on an Indian reservation to tribal members for their own consumption. *Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994); *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 480-81 (1976). Nevertheless, "[o]n-reservation cigarette sales to persons other than reservation Indians . . . are legitimately subject to state taxation." *Id.*  The Supreme Court has repeatedly upheld the imposition of various state tax laws pertaining to the sale of cigarettes on Indian land.  *See,*

*e.g.*, *Milhem Attea*, 512 U.S. at 75-78) (upholding New York's cigarette tax quota system over claim that it imposed excessive burdens); *Oklahoma Tax Comm's v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 512 (1991) (upholding Oklahoma's authority to tax sales of cigarettes to nonmembers of tribe at tribe convenience store); *Calif. Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 12 (1985) (upholding California's right to require tribe to collect tax on sales of cigarettes to non-Indians at tribe's smoke shop); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, (1980) (upholding Washington's right to require tribal smokeshops to affix tax stamps purchased from State to cigarettes prior to sale to nonmembers); *Moe*, 425 U.S. at 483 ("State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax.").

Resolving conflicts between a state's power over residents within its borders and the status of Indians living on tribal reservations does not depend on rigid rules or on mechanical or absolute conceptions of state or tribal sovereignty, but instead on "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Milhem Attea*, 512 U.S. at 73 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980)).

If the legal incidence of a state excise tax fell upon an Indian tribe or tribal member for transactions within the tribe's Indian country, the state would be categorically barred from imposing the tax as a matter of federal law, absent explicit Congressional permission to the contrary. *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458-59 (1995).

> But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy, and may place on a tribe or tribal members "minimal burdens" in collecting the toll.

*Chickasaw*, 515 U.S. at 458-59 (citations omitted).

This Court has already determined that the legal incidence of the TPTA falls on the end consumer rather than on the Community. Accordingly, if the balance of interests favors the State, the State may impose minimal burdens on the Community in collecting its tax.

In this case the State's interests in collecting the cigarette tax clearly outweighs the Tribe's interests in marketing a tax exemption. The Supreme Court has noted that it does "not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." *Colville*, 447 U.S. at 155.

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when

11

the taxpayer is the recipient of state services. As we have already noted, Washington's taxes are reasonably designed to prevent the Tribes from marketing their tax exemption to nonmembers who do not receive significant tribal services and who would otherwise purchase their cigarettes outside the reservations.

*Colville*, 447 U.S. at 156-57.  More recently, in *Milhelm Attea*, the Supreme Court affirmed that the state's interest in collecting cigarette taxes prevails:

States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere.

*Milhelm Attea*, 512 U.S. at 73.

Although the Community has an interest in raising revenues for essential governmental programs, the revenue it derives from the sale of cigarettes to non-Indians comes not from value generated on the reservation but from the marketing of a state tax exemption. The State's interest in collecting revenues from the sale of cigarettes to non-tribal members is much stronger.  Those revenues are essential to the provision of important state services to those non-tribal members.  The Community's sales of untaxed cigarettes also threaten the economic welfare of non-tribal stores in the area that sell cigarettes.  As recognized in *Moe*, a tribe's failure to charge the state tax provided the tribe a "competitive advantage" over all other cigarette retailers.  425 U.S. at 481.  If the Community is permitted to sell tobacco products to non-tribal members without collecting and remitting Michigan's tobacco excise tax, the Community gains a large and unfair competitive advantage over non-Indian sellers who must collect Michigan's excise tobacco tax or face criminal prosecution.

12

The State's interest in collecting revenues from the tribe's cigarette sales to non-tribal members is enhanced in this case because many of the Community's cigarette sales occur at their casinos on trust lands far from the reservation where it is even more likely that sales are being made to non-tribal members and where there is greater competition with non-tribal businesses.  In short, there is no real dispute that the balance of interests favors the State. The focus of this Court's analysis accordingly shifts to the question of whether the burdens imposed by the state's taxation scheme are permissible.

The TPTA requires the tax imposed to be precollected by requiring that tobacco products bear a stamp which indicates that the tax imposed under the TPTA has been paid. M.C.L. § 205.426a; M.C.L. § 205.422(p).  Although taxation of sales by Indian tribes is not specifically addressed in the TPTA, the State Treasurer has adopted administrative rules which require a tribe to purchase tobacco products on which the tax has already been paid. The tribe can then obtain reimbursement by collecting the tax when it sells to non-tribal members, and can file a tax refund claim with the State for cigarettes sold to tribal members.

The Community contends that the burdens imposed by the refund system are unacceptable.  These burdens include the administrative burden of preparing the refund claims and the economic burden from the prepayment of the tax until receipt of the refund.

The administrative burden includes the time invested by the Manager of the Pines Convenience Center in reviewing and printing out the electronic swipe card reports containing the names, enrollment numbers, and quantities of tobacco purchased and then

manually compiling a supplemental report of purchases made by Community members who did not have a swipe card at the time of purchase. This process takes the manager approximately four hours a month. (Gerard Dep. at 29-32). The administrative burden also includes approximately six to seven and one-half hours per month invested by the Community's accountant in completing the forms for the tobacco tax refund claims. (Richards Dep. at 46-56).

The refund system also entails an economic burden because the tribal retailer must wait for tobacco tax refunds and suffers a loss of use of funds during this time period. For sales to non-tribal members, the Community must pay and bear the tax until reimbursed by the customer at the time of retail sale. For sales to tribal members, the Community must pay and bear the tax until reimbursed by the Department after the submission of refund claims and supporting documentation. The State estimates the economic burden to be about $617 per year. (Def. Ex. 17, Darragh Aff. Att. B). The Community contends that the State's estimate is fraught with errors, and that it underrepresents the economic burden, but it has not offered an alternative total. (Streitz Aff. ¶¶ 6-9). The Community has not established that the economic burden imposed by the temporary loss of use of funds is more than minimal.[3]

---

[3]The Court is disturbed by evidence that although the State generally pays interest on refund claims that are not processed within 45 days, it has not paid interest to the Community when the refund checks have been delayed more than 45 days. (Thelen Dep. at 66-70). If this evidence reflects State practice, it is unacceptable. The Court insists that the State timely process the Community's refund claims and live up to its financial obligations. If it does not,

The "minimal burdens" that have been approved by the Supreme Court have included state laws requiring tribes to collect and remit the sales tax from non-Indian purchasers, to maintain records of exempt and non-exempt transactions, to affix stamps to cigarette packages and to undertake various other types of recordkeeping. *See*, *e.g.*, *Colville*, 447 U.S. at 159; *Moe,* 425 U.S. at 483; *Citizen Band*, 498 U.S. at 512-13; *Milhelm Attea*, 512 U.S. at 75-76. The Court is satisfied that the administrative burden of twelve or so hours per month and the economic burden from loss of use of funds is a minimal burden and falls within the scope of those burdens that have been approved by the Supreme Court.

To its credit, the Community does not contend that the administrative and economic burdens, standing alone, fail the minimal burdens test. Instead, the Community contends that these burdens exacerbate the fatal flaw in the refund scheme, which is prepayment of the tax. The Community contends that the prepayment of the tax impermissibly results in the Community paying the state tobacco tax, albeit on a temporary basis.

The Community contends that the refund system is unacceptable because it imposes a direct and compulsory tax upon the Community that it must bear until reimbursed by its customers or by the State. The requirement that the retailer, i.e., the Community, prepay the tax imposes an actual, albeit temporary, tax on the Community. According to the Community, no tax prepayment system has ever been approved by the Supreme Court because it is abundantly clear that "a State is without power to tax reservation lands and

the Court encourages the Community to bring the matter to the Court's attention.

reservation Indians." *County of Yakima v. Confederated Tribes & Bands of the Yakima Nation*, 502 U.S. 251, 258 (1992) (citing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973)). *See also McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 181 (1973) (stating that the state is "totally lacking in jurisdiction" to impose its income tax over the people and the lands of the Navajo Reservation ).

The State denies that its refund system is a tax on the tribe because the consumer bears the legal incidence of the tax and because the tribe is entitled to a full refund for cigarettes sold to tribal members for consumption on the reservation. The State contends that although there is a pre-collection of taxes, there is no ultimate tax on the tribal members for cigarettes consumed on the reservation.

The Supreme Court has never approved a tax refund system for Indian cigarette sales. Neither, however, has it ever rejected one. In fact, there is no evidence that it has ever considered a refund system such as that used by Michigan. In *Milhelm Attea* the Supreme Court upheld an equally comprehensive quota system that limited the quantity of untaxed cigarettes that wholesalers could sell to tribes. The quota was based either on an agreement between the state and the tribe, or, in the absence of an agreement, on the "probable demand" of tax-exempt Indian consumers. 512 U.S. at 65-66.

Defendants have presented evidence that Michigan adopted a refund system as opposed to a quota system based on New York's failed experience with the quota system that was upheld in *Milhelm Attea*, the administrative burdens and delays associated with pre-

approving each delivery of tax exempt cigarettes into Indian County, its reluctance to hold wholesalers liable for discrepancies, the administrative burden of enforcing the quota, and the difficulty of taking action to prevent the sale of tax-free cigarettes in the absence of the inspection, audit and penalties provisions of a tax agreement.  (Fratzke Aff. ¶¶ 19-24).

Michigan's refund system compares favorably to the quota system approved in *Milhelm Attea*.  Instead of requiring retailers to complete and submit a tax exemption coupon before purchasing tax free cigarettes from wholesalers, Michigan allows retailers to submit claims for refunds after the fact.  Retailers are therefore not bound to projections that fall short.  The refund system also promotes tribal sovereignty and self-government because it enables the Community to determine its own process to ensure that only qualified Indian consumers claim the exemption from state taxes.  It also enables the State and the tribe to work together to identify and resolve problems of improper sales more quickly than a quota system.

The State has presented compelling and unrebutted evidence that its choice of a refund system was reasonably necessary to prevent fraudulent sales or tax avoidance.  The State has not been able to reach an agreement with the Community and the Community has brazenly asserted and carried out its intention to sell untaxed cigarettes to anyone and everyone without regard to whether they are members of the Community.

Other than its broad assertion that the prepayment of the state tax is an impermissible, albeit temporary  tax, the only concrete objection the Community has raised is the State's

refusal to provide refunds based upon the State's unilateral determination that the Community's sales to its members had exceeded the amount of cigarettes that could reasonably be consumed by Community members on the reservation.  According to the Community, such a refusal is unreasonable and underscores the fact that the State is in fact taxing the Community on its cigarette sales to its members.

The State's refusal to grant refunds without prior notice to the Community is a matter of some concern to this Court.  Nevertheless, upon review of the totality of the circumstances the Court finds that the State's actions were not as unexpected or as unreasonable as the Community suggests.

The State "lacks authority to tax cigarettes sold to tribal members **for their own consumption**." *Milhem Attea*, 512 U.S. at 64 (emphasis added).  The tax exemption is only for cigarettes to be consumed on the reservation by tribal members. *Id.*  The Community cannot reasonably expect the State to reimburse it for sales to members who buy cigarettes from the Community and then turn around and sell those cigarettes to non-members.  The Community also understands that the amount of cigarettes that can be consumed by Community members is not unlimited. There is evidence that members of the Community were purchasing 18 to 173 cartons of cigarettes in a single month and were selling them over the Internet.  Without a cap on refunds for sales to Community members, there would be no way for the State to ensure any kind of a limit on the quantity of untaxed cigarettes tribal members (or even the tribe) might choose to sell via the Internet.  That increases the risk of

18

loss to the State and to cigarette sellers throughout the State, even those who are not in geographical proximity to the Community's reservation or its gaming facilities.

When the State determined that the Community had sold more cigarettes to its members than those members could reasonably be expected to consume, Walter Fratzke of the Department of Treasury sent a letter to the Community on November 13, 2003, giving notice that the Community's sales to its members were in excess of reasonable consumption. Fratzke requested an opportunity to discuss the situation with a tribal representative to identify and resolve the problems together. (Fratzke Aff. Att. B). Fratzke sent a second letter on March 16, 2004, requesting input from the Community in an effort to reach an agreed upon predetermined amount of exempt sales. The State's communications reflect that the flag number was not a set number, but was open to negotiation. Neither was the flag number pulled out of thin air. The number was a generous estimate based on the tribal population, the Surgeon General's study of tribal smoking rates, and empirical data from other tribes about their population's cigarette consumption. (Fratzke Aff. ¶¶ 32-46). The Community's own two carton limit per week on tribal members is generally consistent with the flag number used by the State. As long as the Community undertakes its obligation to monitor the sales and the reimbursement requests, the Community will receive its refunds and the refund procedure will not impact the Community's sovereignty.

The Court finds, as a matter of law, that the State's refund system does not impose more than minimal burdens on the tribe. Moreover, because the legal incidence of the State

cigarette tax falls on non-member purchasers, and because there is no evidence that the State will not pay refunds for sales to tribal members for their own consumption, the refund system does not present a significant interference with the Tribe's self-government or run afoul of any congressional enactment dealing with the affairs of reservation Indians. *See Moe*, 425 U.S. at 483. Accordingly, the State is entitled to summary judgment on Count IV of the Community's second amended complaint.

## B.  COUNT V - 1842 Treaty

In Count V of its second amended complaint the Community seeks a declaration that Defendants cannot enforce the TPTA against the Community because Article II of the 1842 Treaty with the Chippewa at La Pointe, 7 Stat. 591 (Oct. 4, 1842), continues in force the federal Indian Trade and Intercourse laws within the area ceded by the Treaty.  Article II of the 1842 Treaty provides:

> The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

1842 Treaty, Art. II.

The Community contends that because the Chippewa signatories to the 1842 Treaty understood that Article II would continue the laws of the United States with respect to their trade and intercourse instead of and rather than the laws of Michigan or Wisconsin, the State

lacks jurisdiction to enforce its TPTA with respect to the Community's purchases and sales of tobacco products within the Ceded Area.

For purposes of these cross-motions for summary judgment the Court need not concern itself with disputed issues regarding whether the trade and intercourse provisions of Article II of the 1842 Treaty were superseded or abrogated following the 1854 Treaty, or whether Article II was understood by the signatories to be a liquor clause that was abrogated by Article 7 of the 1854 Treaty, or whether the Community has unclean hands with respect to its 1842 Treaty argument because it routinely ignores the trade and intercourse provisions in its sales of alcohol, tobacco and gambling services. Even if this Court were to assume that the 1842 Treaty is still binding and that it incorporates the Indian trade and intercourse laws, the Court is satisfied that the plain meaning of Article II does not prohibit the State from collecting its excise tax on cigarettes sold by the Community to non-Indians.

Plaintiff contends that Article II imports within the Ceded Area any later enacted federal provisions that govern Indian trade and intercourse as such provisions are enacted, amended or determined over time. According to Plaintiff, the central federal statutes currently governing Indian trade and intercourse are the Indian Trader Statutes, 25 U.S.C. §§ 261-64, pursuant to which the Commissioner of Indian Affairs has sole power to appoint Indian traders and make comprehensive rules and regulations governing "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261.

21

The TPTA does not purport to regulate who the Indians may buy goods from, who they may sell goods to, or even what goods they may purchase or sell. The TPTA merely requires the payment of Michigan State taxes when sales of tobacco products are made to non-Indians. Accordingly, the TPTA does not conflict with federal laws governing Indian trade.

Plaintiff concedes that federal statutory and common law permit the state to impose "minimal burdens" on Indian traders, tribes or tribal members acting within Indian country in collecting state taxes on sales to non-Indians. Plaintiff nevertheless contends that Article II of the 1842 Treaty goes beyond federal requirements in assuring that state laws will not be imposed on the tribe. Plaintiff contends that the parties to the 1842 Treaty understood that the laws of the United States would govern the Indians' trade and intercourse within the Ceded Area rather than, or instead of, state law. According to Plaintiff, Article II gave the Chippewa the right to conduct their trade and intercourse within the Ceded Area under the exclusive regulation and protection of federal laws.

Plaintiff's argument is unconvincing. The 1842 Treaty plainly makes federal law applicable to the Ceded Area, and federal law permits the states to impose their tobacco taxes on cigarettes sales to nonmembers of the Tribe. The 1842 Treaty does not limit the State's ability to impose minimal burdens on the Community to assist in the collection of the State's cigarette taxes. Accordingly, the Defendants are entitled to summary judgment on Count V.

## C.  COUNT VI – Contraband in the U.S. Mail

In Count VI of its second amended complaint the Community seeks a declaration that the classification of tobacco products as "contraband" while such products are in the possession and control of the U.S. Postal Service, unlawfully violates the federal government's exclusive authority to designate what can and cannot be sent through the U.S. Mail.

In seizing the cigarettes from the U.S. Mail the State was not purporting to regulate what could or could not be sent through the U.S. Mail.  It did not seize the packages because they cannot be mailed.  It seized them because they were contraband under State law.

It has long been recognized that the U.S. Mail is subject to search pursuant to search warrants meeting the requisites of the Fourth Amendment.  *Ex Parte Jackson*, 96 U.S. 727, 733 (1878).  Plaintiff correctly notes that the warrant at issue in *Ex Parte Jackson* was a federal warrant.  However, Plaintiff has not directed the Court to any authority, and this Court is aware of none, that would indicate that a state, as opposed to federal, search warrant cannot be used to search and seize evidence of a state crime from the U.S. Mail.

According to Plaintiff, the State's discontinuance of postal searches pursuant to state warrants is a "telling admission" that the seizures were invalid.  No evidence supports this conclusion.  Attorney Levy noted that because some questions had been raised about the validity of state warrants to search the U.S. Mails, he determined that in the future he would

use federal warrants because it was better to be safe than sorry.  (Levy dep. at 9-10).
Contrary to Plaintiff's assertions, this is not an admission that the seizures were invalid.

Plaintiff has failed to present evidence to support its claim that the seizures violated
the Supremacy Clause.  Defendants are accordingly entitled to summary judgment on
Count VI.

### D.  COUNT VII - § 1983 Damages for Search and Seizure

In Count VII of its second amended complaint the Community seeks damages for the
allegedly unreasonable searches and seizures conducted by State Police Officers Reid and
Blanksvard.  The Community contends that the second and third warrants failed to describe
with particularity the items to be seized.  In addition, Plaintiff contends that the warrants
were not supported by probable cause because the affidavits did not establish any basis for
asserting that the tobacco products were illegal or contraband.

Defendants move for summary judgment on Count VII on the basis of qualified
immunity, and on the merits of the Fourth Amendment claim.

The doctrine of qualified immunity provides "that government officials performing
discretionary functions generally are shielded from liability for civil damages insofar as their
conduct does not violate clearly established statutory or constitutional rights of which a
reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In
determining whether a defendant is entitled to qualified immunity the Sixth Circuit employs
a three-step inquiry:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900-01 (6th Cir. 2004) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  Qualified immunity protects the officials from liability unless the answer to all three questions is "yes."  *Id.* at 901.

## 1.  Particularity

In early January 2002 the State Police received a tip that untaxed cigarettes were being transported by U.S. Mail through the U.S. Postal facility in Kingsford.  Defendant Reid drafted the first affidavit, had it approved by Assistant Attorney General Levy, and sent it to Defendant Blanksvard who was in the Upper Peninsula.  Blanksvard signed the affidavit and obtained the warrant from a State Magistrate on January 10, 2002.  Two more warrants were obtained on January 14 and 18, 2002.  Pursuant to these three warrants the State Police conducted four searches.

The affidavit that was attached to the January 10, 2002, search warrant described the parcels by size, markings on the boxes, addressees and shippers.  The addressees were Joe Waara, WCUP 105.7 FM, attn. Eddie Edwards, American Made Tubcraft Plus, and Chippewa Trading, all of Baraga, Michigan.  The shippers were identified as Signals of Erving, New York, Pierce Trading Co. of Erving, New York, and Shinnecuk Smokeshop of

Southhampton, New York.  The affidavit recited that Joe Waara had previously been investigated for receiving untaxed cigarettes in shipments from Erving, New York; that other retailers operating on Native American lands in the Upper Peninsula had received untaxed cigarettes and that seizures of untaxed cigarettes from Erving, New York, to Michigan tribal retailers had already accounted for over $300,000 in seized tobacco products; that none of the shippers referenced in the affidavit were licensed by the Michigan Department of Treasury as tobacco wholesalers, unclassified acquirers, or secondary wholesalers and could not legally ship tobacco into Michigan; and that none of the addressees were licenced under the TPTA.  The search warrant signed by Dickinson County 95th District Court Magistrate Joan Nelson described the parcels by size, markings on the boxes, addressees and shippers.

Plaintiff has no quarrel with the particularity of the January 10, 2002, affidavit and warrant.  Plaintiff focuses instead on the lack of particularity in the subsequent warrants issued on January 14 and 18, 2002.  The January 14, 2002, warrant signed by Dickinson County 95th District Court Judge Michael Kusz described the property to be searched as:

> Any cartons, half cartons, or other shipping container of cigarettes and/or other tobacco products void addressed to or from a party not licensed under the Michigan Tobacco Products Tax Act, without proper markings as required by the Act and/or without Michigan Tobacco Product Tax Stamps.

The January 18, 2002, warrant signed by Dickinson County 95th District Court Magistrate Joan Nelson described the property to be searched as:

> Fourteen boxes of cigarettes to include any cartons, half cartons, or other shipping container of cigarettes and/or other tobacco products void addressed to or from a party not licensed under the Michigan Tobacco Products Tax Act,

26

> without proper markings as required by the Act and/or without Michigan
> Tobacco Product Tax Stamps to include product currently in the control of the
> USPS; and any additional carton, half carton or other container of tobacco
> product as described and in the control of the USPS for a period of 10 days
> from the date this warrant is authorized by the Court.

As Plaintiff correctly points out, these warrants described the internal contents of sealed boxes. The warrants made no reference to the external features of the boxes. Plaintiff contends that the recitation that the items be addressed "to or from a party not licensed" under the TPTA would include the majority of parcels that would come through the Kingsford Postal Service Facility and would authorize the search of virtually every package there.

The Supreme Court has held that "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004). Notwithstanding the generality of the January 14 and 18 warrants, those warrants incorporated by reference the attached affidavits. (Def. Ex. 1-4; Blanksvard Aff. ¶ 11). Those affidavits were significantly more specific than the warrants themselves. The affidavit attached to the January 14 warrant recited that U.S. Postal Inspector Michael Cashmer had advised that there were 97 boxes of cigarettes or other tobacco products addressed to Joe Waara from Signals in Irving, New York, and that both the shipper and the addressee were previously known to have engaged in the shipment and receipt of untaxed tobacco products. The affidavit attached to the January 18 warrant recited that U.S. Postal Inspector Mark Spellman had advised that there were 14 boxes of cigarettes or other tobacco

products addressed to American Made Crafts Plus, W.M. Cup – 105.7 FM, attn. Eddy Edwards, and that the shipper was Pierce Trading Company. The affidavit further recited that these addressees had previously been investigated for receiving untaxed cigarettes from the same shipper.

The failure of the search warrant affidavits to include the dimensions of the boxes or the contents of every shipping label, does not defeat the validity of the affidavits or the warrants for Fourth Amendment purposes. "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought. Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Ables* 167 F.3d 1021, 1033 (6th Cir. 1999) (internal citations and quotations omitted). "Courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).

Plaintiff does not deny that the first affidavit and search warrant satisfied the particularity requirement of the Fourth Amendment. The subsequent search warrants were issued by the same court within a short period of time as part of a series of searches regarding the same subject matter. Many of the boxes had tobacco product markings on their exterior and others were turned inside out to conceal the markings. (Blanksvard Aff. ¶ 13; Reid Aff. ¶ 12). Cigarettes and other tobacco products, whether marked or unmarked, are typically shipped in boxes of a characteristic size and weight and emit the strong and distinctive smell

28

of tobacco.  (Moore Aff. ¶ 5; Reid Aff. ¶¶ 12-13).  The boxes that were the subject of all four

searches had been segregated by the postal employees from all other mail at the Kingsford

Facility before the State Police officers arrived.  (Blanksvard Aff. ¶ 12).  The searches were

all conducted in the presence of a U.S. Postal Inspector.  (Blanksvard Aff. ¶ 10).  All of the

parcels that were opened during the searches contained only unstamped, untaxed cigarettes

and other tobacco products.  (Blanksvard Aff. ¶¶ 23, 33, 43).

Al of the boxes actually searched pursuant to the second and third warrants were

addressed to WCUP and American Made Tubcraft and were shipped by Signals and Pierce

Trading, all of whom were identified in the first search warrant and affidavit.  It is clear from

the evidence that based upon the uniformity of the cigarette shipping containers, their smell,

the common addressees and shippers, the segregation of those boxes by the postal employees

before the execution of the search warrant, and the fact that the searches only resulted in the

untaxed cigarettes and tobacco products, the search warrants and affidavits were sufficient

to satisfy the particularity requirement.

Furthermore, even if the warrants violated the particularity requirement of the Fourth

Amendment, and even if that right was clearly established, Defendants would be entitled to

qualified immunity because their conduct was not objectively unreasonable.  The second and

third search warrants were continuations of the first undisputedly particularized warrant; they

were brought to the same court; they were reviewed by judicial officers; and they received

judicial approval.  The officers' reliance on those warrants was not objectively unreasonable.

## 2.  Contraband

The Community contends that in addition to the particularity problem the warrants also violated the Fourth Amendment because they lacked probable cause.  In support of this assertion the Community contends that the warrants rested on the false premise that boxes of unstamped tobacco products in the sole custody and control of the U.S. Postal Service but addressed to a nonlicensee under the Act constitute "contraband" as defined in M.C.L. § 205.429.

The Community asserts that the State conceded in its responses to the Community's requests for admissions that the cigarettes were not contraband within the meaning of the TPTA while in the possession and control of the U.S. Postal Service.  (Pl. Op. Br. at p. 14, Docket # 221).  This assertion misrepresents the State's responses.  The State merely stated that the U.S. Postal Service was not a "transporter" as that term is used in the TPTA because the U.S. Postal Service is not subject to the TPTA.  (Pl. Op. Br. Ex. E., responses Nos. 23-25, Docket # 221).  The State made no admissions that the cigarettes themselves were not contraband.

Cigarettes constitute contraband only if they are "held, owned, possessed, transported, or in control of a person in violation of this act."  M.C.L. § 205.429.  The Community acknowledges that it was the owner of at least some of the unstamped cigarettes that were seized during the searches at the Kingsford Mail Facility.  The Community nevertheless

asserts that mere "ownership" of a tobacco product by a person does not violate any provision of the Act, and thus tobacco products cannot be "owned . . . in violation of this act."

It is a violation of the TPTA for a person to acquire cigarettes for resale without a license.  M.C.L. § 205.423.  There is no question that the Community was acquiring the cigarettes for the purpose of resale.  Accordingly, the Community's ownership of the cigarettes was in violation of the TPTA and the cigarettes constituted contraband. Furthermore, even if the individual officers' belief that the cigarettes were contraband had been incorrect, such a belief did not violate clearly established law and was not objectively unreasonable.

The searches and seizures conducted by the State did not violate the Fourth Amendment.  Moreover, even if they did, the individual State Defendants would be entitled to qualified immunity.  Accordingly, Defendants are entitled to summary judgment on Count VII.

## E.  COUNT VIII – Sovereign Immunity

In Count VIII the Community seeks a declaration that the past seizures of property owned by the Community, as well as any future such seizures, violate the Community's sovereign immunity.  The Community contends that the State had no jurisdiction over either the Community or its property.

In *Colville* the State of Washington seized unstamped cigarettes outside of the reservation's borders as they were being transported to the reservation. The Supreme Court

approved the state's power to seize the unstamped cigarettes as contraband where the tribe

did not cooperate in collecting the state's taxes on sales made to non-Indians. *Colville*, 447

U.S. at 161-62.

> We find that Washington's interest in enforcing its valid taxes is sufficient to
> justify these seizures. Although the cigarettes in transit are as yet exempt from
> state taxation, they are not immune from seizure when the Tribes, as here, have
> refused to fulfill collection and remittance obligations which the State has
> validly imposed. It is significant that these seizures take place outside the
> reservation, in locations where state power over Indian affairs is considerably
> more expansive than it is within reservation boundaries.

*Id.* Seizures were also specifically identified as one of the state's enforcement options in

*Citizen Band*. The Court noted that although states could not proceed against Indian tribes

to enforce their cigarette taxes, "States may of course collect the sales tax from cigarette

wholesalers, either by seizing unstamped cigarettes off the reservation, or by assessing

wholesalers who supplied unstamped cigarettes to the tribal stores . . . ." 498 U.S. at 514

(citations omitted).

The Community contends that although seizures of untaxed cigarettes were upheld in

*Colville*, and endorsed in *Citizens Band*, the absence of a discussion on the issue of

sovereignty suggests that the cigarettes were not owned by the tribes but by wholesalers.

Although the Supreme Court did not expressly allow seizure of untaxed cigarettes

owned by Indians in *Colville*, it does not appear to this Court that the Supreme Court would

prohibit such seizures. Seizures are one of the few remedies left to the State. It does not

appear to this Court that the question of ownership was a determinative factor in *Colville*.

The Court is satisfied that the Supreme Court would not have reached a different decision as to the legitimacy of the seizure in *Colville* even if it had determined that the cigarettes were owned by the tribe.  It was sufficient that the cigarettes were contraband under state law and that they were seized off reservation.  Accordingly, Defendants are entitled to summary judgment on Count VIII.

## F.  COUNT IX – Contraband

In Count IX the Community seeks a declaration that none of the seized tobacco products were "contraband" within the meaning of the TPTA.

As this Court explained in the discussion in Part III D (2) above regarding probable cause for the warrant, the acquisition of cigarettes for resale without a license is a violation of the TPTA.  M.C.L. § 205.423.  The Community's ownership of the cigarettes for the purpose of resale was accordingly a violation of the TPTA and the cigarettes were contraband within the meaning of the TPTA.  M.C.L. § 205.429.

## G.  COUNT X – Permanent Injunction

In Count X of its second amended complaint the Community seeks a permanent injunction prohibiting the State from enforcing the TPTA against the Community, including an injunction against the seizure of contraband tobacco products being transported by the U.S. Postal Service for delivery to the Community.

Because this Court has already determined that the Community has not prevailed on the merits of its claims, the Community is not entitled to permanent injunctive relief. Defendants are entitled to judgment on Count X and Count X will accordingly be dismissed.

**H.  COUNT XI - Attorney Fees**

In Count XI of its second amended complaint the Community seeks attorney fees under 42 U.S.C. § 1988 with respect to its Count VII claims under 42 U.S.C. § 1983 for damages and injunctive relief.  Attorney fees are available under § 1988 only to the "prevailing party."  The Community is not a prevailing party in this action and Defendants are according entitled to judgment on Count XI as well.

## IV.

Because this Court is entering judgment in favor of Defendants on all of Plaintiff's remaining claims, Defendants' objections to the Magistrate Judge's order denying motion to amend answer (Docket # 276), Defendants' motion to exclude the testimony of KBIC's treaty expert, Dr. Bruce White (Docket # 283), Defendants' motion to exclude the testimony of KBIC's damages expert, Dr. Timothy Nantell (Docket # 284),  Defendants' motion to exclude the financial records relied upon by Dr. Nantell (Docket # 286), and Plaintiff's motion in limine to exclude certain revenue and expenditure evidence (Docket # 294) will be denied as moot.

An order and judgment consistent with this opinion will be entered.


Date:    September 12, 2005          /s/ Robert Holmes Bell
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE